35 F.3d 567
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jerry Preston THOMAS, Jr., Antonio Vallegos, and Tony Lou
Garza, Defendants-Appellants.
 Nos. 93-1873, 93-1905 and 93-1954.
 United States Court of Appeals, Sixth Circuit.
 Sept. 13, 1994.
 
 Before: JONES and RYAN, Circuit Judges, and KRUPANSKY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants-Appellants Jerry Preston Thomas, Jr., Antonio Vallegos, and Tony Lou Garza appeal their convictions and sentences for multiple counts of possession of marijuana with intent to distribute, in violation of 18 U.S.C. Sec. 841(a)(1), aiding and abetting the distribution of marijuana, in violation of 18 U.S.C. Sec. 2, and conspiring to possess marijuana with intent to distribute, in violation of 21 U.S.C. Sec. 846. We affirm Defendants' convictions, but we vacate their sentences and remand for resentencing.
 
 
 2
 * At a jury trial held in March 1993, Detective Dennis McMahan of the Saginaw Township Police Department testified that he began to investigate Defendants' activities in October 1991, and that on at least 8 occasions between January 28 and July 17, 1992, while working undercover, he purchased various quantities of marijuana ranging from four ounces to two pounds, from Thomas and Vallegos. During at least one of these sales, Garza accompanied Thomas and supplied Thomas with the marijuana. During other sales, Vallegos and Thomas were accompanied by co-conspirators Michael Castillo or Adrian Martinez. McMahan's testimony was corroborated in part by taped telephone conversations between McMahan and Thomas or Vallegos, in which some of the drug deals were arranged.
 
 
 3
 McMahan also testified that Norman Wilson, a paid informant, had called McMahan on January 28, 1992, stating that Thomas and Garza had obtained over a thousand pounds of marijuana. J.A. at 152. This particular statement was uncorroborated.
 
 
 4
 McMahan further testified that, on September 27, 1992, he arrested Vallegos, who, at that time, had possession of a small amount of marijuana. Upon his arrest, Vallegos told McMahan about his participation in marijuana trafficking.
 
 
 5
 FBI Agent Gary Reineke testified that, on September 17, 1992, he and fellow agent Jerry Nolan executed a search warrant at Garza's residence and found approximately four pounds of marijuana. At that time, Garza admitted to Reineke that he had been selling marijuana since December 1991 or early January 1992, and that his supplier was Juan Hernandez. Garza stated to Reineke that he purchased no more than four pounds at a time. J.A. at 267. Garza further stated that Hernandez's girlfriend helped Garza to get in touch with Hernandez.
 
 
 6
 Co-conspirator Michael Castillo testified that he was the one who had introduced Thomas to Vallegos, in order that Thomas could purchase marijuana from Vallegos to sell to McMahan. Castillo also admitted being present on two occasions when Vallegos sold marijuana to McMahan.
 
 
 7
 The jury acquitted Garza on one count but otherwise found Defendants to be guilty as charged. In June 1993, Defendants were sentenced. This appeal followed.
 
 II
 
 8
 Four of the issues raised by Defendants pertain to the propriety of their jury trial. They argue that: (A) the district court abused its discretion in allowing government agents to testify as experts; (B) the court abused its discretion in admitting Detective McMahan's hearsay testimony regarding a 1000 pound shipment of marijuana, or in failing to give an adequate cautionary instruction with regard to this testimony; (C) the prosecutor engaged in misconduct; and (D) the court erred in denying Garza's Rule 29 motion for acquittal.
 
 
 9
 * Defendants argue that the court erred by allowing FBI agent Mark Miller and Detective McMahan to testify as experts on illegal drug trafficking. At trial, Defendants did not object to the witnesses' qualifications to give expert testimony, so we review only for plain error. United States v. Slone, 833 F.2d 595, 598 (6th Cir.1987); United States v. Smith, 561 F.2d 8, 13 (6th Cir.), cert. denied, 434 U.S. 958 (1977). "The plain error doctrine mandates reversal 'only in exceptional circumstances' and only where the error is so plain that 'the trial judge and prosecutor were derelict in countenancing it.' " Slone, 833 F.2d at 598 (quoting United States v. Mendez-Ortiz, 810 F.2d 76, 78 (6th Cir.1986), cert. denied, 480 U.S. 922 (1987); United States v. Hook, 781 F.2d 1166, 1172 (6th Cir.), cert. denied, 479 U.S. 882 (1986); United States v. Frady, 456 U.S. 152, 163 (1982)).
 
 
 10
 Some of our sister circuits have found that qualifying fact witnesses as experts can, at times, be an improper way of bolstering the fact witnesses' credibility. See, e.g., United States v. Cruz, 981 F.2d 659, 663 (2d Cir.1992) ("We reaffirm here the principle that the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct, at least where the witness's version is not attacked as improbable or ambiguous evidence of such conduct."). However, in Cruz and other similar cases, the expert testimony was prejudicial to an extent that is simply not present in the instant case. The expert testimony here was purely background information and did not serve to improperly bolster any witnesses' credibility. Therefore Defendants' argument is meritless.
 
 B
 
 11
 McMahan testified at trial that Norman Wilson had told McMahan that Thomas had told Wilson that a 1000 pound marijuana shipment was in Garza's possession. Garza contends that this testimony was hearsay and should not have been admitted, and that the court's cautionary instruction regarding this testimony was inadequate. The record indicates that it was admitted, not for the truth of the statement, but as background for understanding McMahan's actions on that day. The court cautioned the jury:
 
 
 12
 In this kind of statement, ladies and gentlemen, the only thing you can consider that testimony for is whether he was told that. That statement is attributed to somebody who's not in court right now and not being examined right now. And I'm going to allow that testimony to stand but it only--all it shows at this point is this witness was told that that was the case, it doesn't prove that that was the case, that there was this thousand pounds or anything of that nature, that this is no evidence on that nature. So this is a limited purpose evidence to explain what this witness did next or decided to try to accomplish next.
 
 
 13
 J.A. at 153.
 
 
 14
 Although we agree with the government that the court would not have abused its discretion had it admitted the testimony accompanied by an appropriate cautionary instruction, we agree with Defendants that this particular cautionary instruction was so nearly incomprehensible as to be entirely inadequate. Nevertheless, because the case against Defendants was overwhelming, we decline to reverse Defendants' convictions on the basis of this instruction. Under the circumstances of this case, the inadequacy of the instruction was mere harmless error.
 
 C
 
 15
 Thomas complains of four instances of alleged prosecutorial misconduct. Although we agree that actual misconduct occurred in two of these four alleged instances, in light of the overwhelming evidence of Thomas's guilt and Defendants' counsels' failure to object at trial, we find no reversible error.
 
 
 16
 First, the prosecutor elicited testimony from a local undersheriff, Duane Bean, to the effect that, when Bean was observing co-conspirator Hernandez's house, he discovered that Hernandez's 15 year old son, who was approaching the house after getting off of a bus, was in possession of some marijuana. The prosecutor asked the detective, "What kind of bus are you talking about?" Bean replied, "School bus." J.A. at 281. None of the defendants objected at the time. Thomas contends that this question was irrelevant and was calculated to incite the passions and prejudices of the jurors, which constitutes prosecutorial misconduct. See United States v. Solivan, 937 F.2d 1146, 1151 (6th Cir.1991) (explaining that comments calculated to incite jurors' prejudices and passions are impermissible).
 
 
 17
 We agree with Thomas that the prosecutor's question was irrelevant. Had there been an objection, it would have been appropriate for the court to sustain it. However, while we agree that no legitimate purpose was served by the question, we do not find that it rises to the level of misconduct. The prosecutor never hearkened back to Bean's "school bus" testimony. Rather than asking any follow up questions or making any comments about it, the prosecutor simply changed the subject. Later, in summation, he made no emotional appeal to the jury based upon the use of marijuana by school children. Thus, the testimony to which Thomas objects consists of two isolated words uttered in the middle of the second day of a four day trial. At worst, if the prosecutor had any fleeting idea at all about improperly inciting the jurors' passions or prejudices, his efforts to do so were not effective, and the idea was promptly abandoned in favor of a more appropriate strategy.
 
 
 18
 Second, in closing argument, after stating that the evidence presented indicated that Defendants were drug dealers, rather than merely drug users, the prosecutor stated: "And yet, as the government understands the defense in this case, these defendants want you to vote to acquit them so that they can walk out this courtroom as if none of this ever happened." J.A. at 330. Thomas argues that this remark unfairly characterized Defendants as a danger to the community. We disagree. In context, the prosecutor was merely commenting that acquittal would be inappropriate in light of the overwhelming evidence presented by the government. We discern no misconduct in this statement.
 
 
 19
 Third, the prosecutor remarked during closing argument that Thomas had been in a motorcycle accident "because he was ingesting marijuana at the time of the accident." J.A. at 332. We agree with Thomas that this remark, which was unsupported by any evidence, was inexcusably improper. However, once again, Thomas's counsel failed to object.[1]
 
 
 20
 Fourth, Thomas complains that the prosecutor improperly criticized Garza's attorney by stating:
 
 
 21
 Members of the jury you are being sold a bill of goods if you accept the arguments that have been advanced here particularly by the attorney for Mr. Garza. You are being flim flammed and you will be allowing yourself to be flim flammed.
 
 
 22
 Transcript of Closing Arguments at 44. Thomas argues that this prejudiced all three Defendants insofar as the prosecutor treated "the defense" as a team. We agree with Thomas that the quoted statements are entirely improper and that, in context, they prejudiced not only Garza, but all three defendants. However, once again, no objection was made to this statement.
 
 
 23
 In light of the overwhelming evidence of Thomas's guilt, we hold that these two isolated improprieties constitute harmless error. We stress, however, that we strongly disapprove of the remarks that are the subject of Thomas's third and fourth complaints. Had Defendants' counsel objected, the proper course of action for the district court would have been to chastise the prosecutor for speculating as to facts not in evidence and for engaging in ad hominem attacks on defense counsel, and to instruct the jury to disregard the objectionable remarks. In a closer case than this one, the court's failure to do so could indeed have constituted reversible error. See United States v. Carroll, --- F.3d ----, No. 93-5030, Slip Op. at 19-20 (6th Cir. June 22, 1994). But reversal on this basis is unwarranted where, as here, no objection was made and the case is not otherwise close. See id. at 20; United States v. Bess, 593 F.2d 749, 757 (6th Cir.1979).
 
 D
 
 24
 At the close of the government's evidence, Garza moved for an acquittal pursuant to Fed.R.Crim. 29. The district court denied the motion. Garza failed to renew his motion at the close of all of the evidence. Absent a manifest miscarriage of justice, this constitutes a waiver of the right to challenge the sufficiency of the evidence against Garza on appeal. United States v. Morrow, 977 F.2d 222, 230 (6th Cir.1992) (en banc ), cert. denied, 113 S.Ct. 2969 (1993).
 
 
 25
 There is no miscarriage of justice here. Garza's Rule 29 argument is that there is a variance between the indictment and the evidence presented at trial; the indictment alleged a single conspiracy, while the evidence allegedly showed multiple conspiracies. This sort of variance is reversible error only where substantial prejudice results from the defendant's being tied with others who were not his co-conspirators. Kotteakos v. United States, 328 U.S. 750, 756-57 (1946); United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir.1991). The evidence here directly indicated that Garza conspired with Thomas to sell marijuana, and that Thomas conspired with Vallegos, Castillo, and others; Garza's only point is that no evidence connects him to Vallegos and the others. Garza's sentence was not increased by amounts of marijuana for which Vallegos was responsible. Under these circumstances, the difference between a single conspiracy encompassing both Garza and Vallegos, and multiple conspiracies where Garza was involved in only one of the sub-conspiracies, is inconsequential.
 
 III
 
 26
 The four remaining issues raised by Defendants pertain to the propriety of their sentences. A court's factual findings in relation to the application of the Sentencing Guidelines are subject to a deferential "clearly erroneous" standard of review. See 18 U.S.C. Sec. 3742(e)(4); United States v. Garner, 940 F.2d 172, 174 (6th Cir.1991). A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).
 
 
 27
 Defendants argue that the sentencing court's findings were clearly erroneous when it determined that: (A) Thomas was an organizer or leader under U.S.S.G. Sec. 3B1.1(a);[2] (B) Garza was a manager or supervisor under U.S.S.G. Sec. 3B1.1(b);[3] (C) for purposes of calculating Defendants' base offense level, Thomas and Garza were responsible for 700 to 1000 kilograms of marijuana; and (D) Vallegos was responsible for 20 to 40 kilograms of marijuana.
 
 
 28
 * Thomas argues that the trial court erred in finding that he was the organizer or leader of a conspiracy involving 5 or more participants. This finding resulted in a four level upward adjustment under Sec. 3B1.1(a).
 
 
 29
 As we recently stated in United States v. Bashara:
 
 
 30
 The commentary to U.S.S.G. Sec. 3B1.1 lists seven factors that may be considered in determining the extent of a defendant's role in the criminal activity: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. As we have recently noted, "there is no requirement, however, that each factor be met."
 
 
 31
 --- F.3d ----, No. 93-2020, Slip Op. at 6 (6th Cir. July 5, 1994) (citing Sec. 3B1.1 comment. (n. 3), and quoting United States v. Ospina, 18 F.3d 1332, 1337 (6th Cir.), cert. denied, 114 S.Ct. 2721 (1994)).
 
 
 32
 In the present case, a preponderance of evidence supports the court's finding that Thomas organized drug selling activity involving at least five participants: himself, Garza, Vallegos, Mike Castillo, and Adrian Martinez. It may be true that Thomas did not give anyone orders, but the evidence suggests that he was primarily responsible for organizing the various illegal activities: in addition to buying and selling marijuana himself, he was the one who brought the other conspirators together with McMahan, and it appears that he actively sought a new conspirator to replace Garza during the course of the conspiracy. Evidence supporting factors (2), (3), and (5), then, indicate that the application of Sec. 3B1.1(a) to Thomas was appropriate.
 
 B
 
 33
 Garza objects to the court's characterizing him as a manager or supervisor of activities involving five or more participants. This characterization resulted in a three level upward adjustment under Sec. 3B1.1(b). We find that this objection has merit. Applying the seven factors listed in the previous section, we find no evidence in the record that Garza managed or supervised anything. Garza's role in the conspiracy apparently was limited to buying and selling marijuana, and "mere buying and selling, without other evidence, is not sufficient to show that a defendant is a leader, organizer, manager, or supervisor." United States v. Schultz, 14 F.3d 1093, 1099 (6th Cir.1994); see also United States v. Gibson, 985 F.2d 860, 866 (6th Cir.) (holding that, although sentencing court has "broad discretion" in applying Sec. 3B1.1, "more is required than a mere buyer/seller relationship."), cert. denied, 113 S.Ct. 2981 (1993).
 
 C
 
 34
 The United States Probation Department's presentence report on Garza recommended that he be held responsible for between 400 and 700 kilograms of marijuana, which would result in a base offense level of 28. This amount of marijuana primarily consisted of the alleged 1,000 pound shipment mentioned in section II(B) above--McMahan testified that informant Wilson had told McMahan that Thomas had told Wilson that Garza had received this shipment. Although this testimony was hearsay, the law in this circuit is that hearsay evidence may be considered in sentencing under the guidelines "so long as it has sufficient indicia of reliability to support its probable accuracy." United States v. Silverman, 976 F.2d 1502, 1513 (6th Cir.1992) (en banc ) (quoting United States v. Herrera, 928 F.2d 769, 774 (6th Cir.1991), cert. denied, 113 S.Ct. 1595 (1993)); see also U.S.S.G. Sec. 6A1.3(a); United States v. Crowell, 997 F.2d 146, 149 (6th Cir.1993).
 
 
 35
 Both the government and Garza objected to the Department's recommendation. Garza claimed that the alleged 1000 pound shipment never existed. The government claimed that Garza was responsible not only for the alleged 1,000 pounds, but also for an additional 500 pounds of marijuana, which placed him in the 700 to 1000 kilograms range of the sentencing guidelines. The government further claimed that Garza could have handled 5-10 pounds of marijuana per day throughout the conspiracy period (between January 28 and September 17, 1992). Addendum to Garza's Presentence Report (Government's Objections); J.A. at 333. The court agreed with the government, and assigned Garza a base offense level of 30.
 
 
 36
 Thomas's presentence report, written by a different probation officer, also acknowledges the hearsay reference to the 1,000 pound shipment, but does not mention any additional 500 pounds. Despite the reference to the alleged 1,000 pounds of marijuana, the report recommended that Thomas only be held responsible for 7.37 kilograms of marijuana, which would result in a base offense level of 14 under the sentencing guidelines. The government objected that Thomas should be held jointly responsible for all of the marijuana held by Garza. The court agreed.
 
 
 37
 On appeal, both Garza and Thomas argue that the only evidence to support the existence of the alleged 1,000 pound and 500 pound shipments of marijuana was hearsay lacking any indicia of reliability, and that the government's claim that Garza could handle between five and ten pounds of marijuana per day was pure speculation unsupported by any evidence. Thomas further argued that the information about the alleged 500 pounds indicated that it was simply part of the 1,000 pound shipment, and so it should not be counted separately. Finally, Thomas argued that he should not be held responsible for Garza's alleged 1,000 pound shipment.
 
 
 38
 We cannot fault the court for crediting McMahan's testimony that Wilson had told him about a 1,000 pound shipment. Because the court had the first-hand opportunity to observe McMahan's demeanor, and because so much of McMahan's other testimony was corroborated by other evidence in the record, it was reasonable for the court to find McMahan to be a reliable witness. A closer question is whether Wilson's statement to McMahan has sufficient indicia of reliability to support its probable accuracy. We believe that it does. The record suggests that Wilson passed a great deal of other information onto McMahan, most or all of which appeared to be accurate, and that Wilson's assistance was invaluable in obtaining evidence against the conspirators. We conclude, then, that it was not clearly erroneous for the court to hold Garza responsible for the alleged 1,000 pound shipment.
 
 
 39
 Neither was it clearly erroneous for the court to hold Thomas responsible for Garza's alleged 1,000 pound shipment. According to McMahan, when Thomas told Wilson of the 1,000 pounds, Thomas also stated that he would personally sell a part of this shipment. J.A. at 152.
 
 
 40
 However, we agree with Garza and Thomas that the court clearly erred in finding that a 500 pound shipment existed separately from the 1,000 pound shipment. The sole reference in the record to the "additional" 500 pounds occurs in amended p 14 of Garza's presentence report:
 
 
 41
 The undercover officer was advised by Jay Thomas that MR. GARZA was holding approximately 1,000 pounds of marijuana which had arrived on January 27, 1992. Approximately four to six weeks after receiving this information, Mr. McMahan, the investigating officer, was contacted by a Drug Enforcement Administration (DEA) agent. The DEA advised the officer they had obtained information from a source different from Jay Thomas who indicated MR. GARZA was holding approximately 500 pounds of a 1,000 pound shipment of marijuana.[4]
 
 
 42
 The government argued to the court that, because the DEA's confidential informant "saw" the 500 pounds of marijuana six weeks after the arrival of the 1,000 pound shipment, "common sense" suggests that it must have been part of a separate shipment. Addendum to Garza's Presentence Report (Government's Objections); J.A. at 334-36. This constitutes a mischaracterization of the information set forth in amended paragraph 14 of the report. Nowhere in the record is there any hint that the informant first learned about the alleged 500 pounds a full six weeks after the alleged January 27th 1,000 pound shipment. The Presentence Report states only that the informant told the DEA agent of the 500 pounds six weeks later; it is silent as to when the informant first learned of the 500 pounds.[5]
 
 
 43
 Further, the Report states that the informant's understanding of the alleged 500 pounds was that it was indeed part of the 1,000 pounds, so the prosecutor's "common sense" conclusion is not only unsupported by the evidence; it is contradicted by it.
 
 
 44
 Moreover, our review of the record reveals no support whatever for the government's claim that Garza could have handled five to ten pounds of marijuana per day during the conspiracy period. To the contrary, the record indicates that Thomas turned to Vallegos as a source for marijuana in May 1992 specifically because Garza was "running dry" as a source and was unable to supply Thomas's needs.
 
 
 45
 In short, then, although we affirm the lower court's finding that Garza and Thomas are responsible for a 1,000 pound shipment, we reverse as clearly erroneous its finding that they are also responsible for an additional 500 pound shipment or for being able to handle sales of five to ten pounds per day.
 
 D
 
 46
 The lower court held Vallegos responsible for 20 to 40 kilograms of marijuana, resulting in a base offense level of 18. This holding was based on McMahan's testimony that Vallegos called him an average of 2 to 3 times per week from mid-May to mid-September, 1992, each time trying to sell 1 or 2 pounds of marijuana. The court erroneously figured that this went on for 30 weeks; the record indicates that it only went on for 17 weeks. Based on this error, the court calculated an average of 1 pound per phone call, 2 calls per week, for 30 weeks, for a total of 60 pounds, or more than 27 kilograms of marijuana. However, if one performs this calculation for only 17 weeks, the result is less than 15 and a half kilograms of marijuana, which justifies a base offense level of 16. We find, then, that the court's calculation was clearly erroneous, and so we remand for resentencing.
 
 IV
 
 47
 For the foregoing reasons, we affirm all three of the defendants' convictions, but we vacate their sentences and remand for resentencing in accordance with this opinion.
 
 
 
 [1]
 Thomas claims that counsel for Garza did object at this point, but the record shows that Garza's counsel objected to an unrelated point made by the prosecutor. J.A. at 332
 
 
 [2]
 Section 3B1.1(a) provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."
 
 
 [3]
 Section 3B1.1(b) provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels."
 
 
 [4]
 We note that this paragraph mischaracterizes McMahan's description of what happened. According to McMahan, Thomas did not himself tell McMahan about the alleged 1,000 pounds; rather, it was Wilson that mentioned the shipment to McMahan. Further, the "source different from Jay Thomas" referred to in the paragraph may well have been Wilson himself. Thus, as far as we know, there may have only been one source for the information regarding the alleged 1,000 pounds
 
 
 [5]
 Further, there is no indication that the informant "saw" the alleged 500 pounds at all