**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0572n.06
Filed: July 7, 2005

No. 04-1449

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **Kenneth Brandt,** | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | |
| | ) | |
| **v.** | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| **Bruce Curtis, Warden,** | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| **Respondent-Appellee.** | ) | |
| | ) | |
| | ) | |

BEFORE:     **MERRITT and DAUGHTREY, Circuit Judges, and PHILLIPS,[1] District
Judge**.

     **MERRITT, Circuit Judge.**  This is a habeas case involving a brutal sexual assault against

a five-year-old girl.  The petitioner, Kenneth Brandt, was convicted by a Michigan jury and

sentenced to two concurrent terms of 20-40 years.  He has maintained his innocence and now raises

two claims of constitutional error, both of which have been fully exhausted in the Michigan state

courts.  First, he claims his trial counsel provided ineffective assistance by failing to object to the

admission of hearsay statements made at trial by the victim's parents and treating physician and by

introducing additional hearsay statements made by an investigating police officer.  All of the hearsay

---

     [1]The Honorable Thomas W. Phillips, United States District Judge for the Eastern District
of Tennessee, sitting by designation.

evidence involved statements originally made by the child-victim soon after the assault. Second, he claims he was denied a fair trial, in violation of due process, by the trial judge's "prejudicial remarks" and his frequent interruptions and "scolding [of the] defense counsel in front of the jury." For the reasons set forth below, we affirm the District Court's denial of the writ.

**Facts**

On Sunday, December 21, 1997, Brittany Bowles, a five-year-old girl, was living with her unmarried parents, Sherry Faes and Tommy Bowles, in Detroit, Michigan. Faes testified at trial that she bathed Brittany that morning, around 11:00 a.m., and did not notice any injuries or abnormal behavior. Bowles had left home early that morning to participate in court-mandated community service for a past offense. Around 2:00 p.m., petitioner Brandt, who often babysat Brittany at his apartment a few blocks from the victim's home, arrived to pick-up Brittany.[2] It is unclear if he requested to babysit that day or if Faes asked him to babysit so she could have a "break" to clean the house and do laundry.

Brandt testified that he took Brittany to his apartment and played video and board games with her in his bedroom, and that nothing untoward or inappropriate occurred. Steven James, Brandt's housemate, testified that he saw Brandt take Brittany into Brandt's bedroom, where they remained for most of the afternoon with the door closed. During his testimony, Brandt accused no one. He simply claimed that, while he had custody of Brittany, she was not harmed by him or anyone else.

---

[2]In a post-conviction hearing, the trial judge described Brandt's home as a "boarding house for men. There were no women and no families living there." J.A. at 127a.

Bowles returned home from community service around 4:30 p.m. By about 7:30, he told Faes to retrieve Brittany from Brandt's, since it was getting late. She began walking to Brandt's and encountered Brandt, James and Brittany walking back to the Bowleses' residence.[3] Faes testified that she quickly noticed Brittany was walking "weird" but she did not question her about it at the time. All four returned to the Bowles home and visited in the living room for approximately twenty minutes. There was conflicting testimony about whether, when Brandt was ready to leave, he hugged and kissed Brittany or vice versa, but there was some contact between the two shortly before Brandt and James left the home. Brittany then quickly went into the bathroom.

When her mother checked on her, she found Brittany standing in front of the mirror with her shirt off. Based on her own experiences and "mother's intuition," Faes concluded that Brittany had been molested and hysterically said to Bowles that "Kenneth done [sic] something to the baby," and "that sick bastard touched that baby." J.A. at 225a & 235a. Bowles took Brittany into her bedroom and questioned her, asking, "[D]id Kenny touch you in any way?" She denied that he had touched her and replied that she was simply tired. Bowles asked her several more times with the same result, before eventually asking her "did Kenny ever tell you that he would hurt mommy or daddy if you told us something?" Brittany replied that Brandt had said he would kill them. She then responded that he had touched her and indicated where by pointing down, toward her genital area.

Faes ran to a neighbor's home to use the phone to call the police. The neighbor, in turn, went

---

[3]Although the residence in question was actually occupied by Tommy Bowles, Sherry Faes and Brittany Bowles, for the sake of simplicity we will use only the Bowles last name when referring to it.

to the Bowles home to try and help with Brittany. When the neighbor arrived, Bowles left, walked to Brandt's, and reportedly threatened to kill him if he had molested his daughter. Bowles's testimony does not specify the time of this encounter, but we can infer from his timeline of events that it occurred approximately an hour after Brandt dropped Brittany off. In his testimony, Brandt reported a longer period of time, approximately three hours, between his dropping Brittany back at home and Bowles's arrival at Brandt's residence. Brandt's implied defense was that someone else, presumably one of Brittany's parents, actually molested Brittany during this period.

After both Bowles and Faes had returned home, the police arrived and advised them to take Brittany to the hospital, which they promptly did.

Dr. Earl Hartwig was Brittany's treating physician in the emergency room. His first contact with Brittany occurred around 12:50 a.m. on December 22, 1997. He physically examined her and interviewed her with her mother, Ms. Faes, present. When he had Brittany remove her underwear he noticed "a large wad of some type of either tissue or paper towel type of material that was within her underclothes that also contained a significant amount of blood and again, some type of discharge . . . that we didn't know the nature of at the time." J.A. at 367a. His physical examination revealed very serious injuries to Brittany's vaginal and anal areas.

> As far as the genital examination is concerned Brittany presented with significant injuries to her vaginal area, to the hymenal area and to the urethra area which is where you urinate from. There were gross abnormalities there with significant amount of bleeding, swelling, abrasion and bruising. As far as examination of her anal area she showed significant redness as well, along with abrasion or essentially raw skin, laxity or [sic] rectal tone and also a discharge of blood and some other type of discharge going from the anal area as well as from the vaginal area.

J.A. at 173-74. In response to questioning about the relative severity of Brittany's injuries, Dr.

Hartwig stated that of the several hundred children he had examined for sexual assault, Brittany's case was "clearly one of the worst I've seen." J.A. at 185. Although he could not determine what object or body part had penetrated her, the doctor did testify that her injuries were "consistent with penetration." As to the timeframe of the injuries, he testified that her parents indicated a time of injury between six and eight p.m. the previous day. He found the injuries to be consistent with that approximation. In addition, however, he could not determine whether some of the injuries had occurred earlier.

> I would speculate that there were previous injuries, - there was a large amount of injuries present here, - the degree of injury, I wouldn't expect to see on one, one penetrating traumatic event. However, I couldn't tell you with certainty that there was previous or not [sic]. The discharge also would suggest that there was some type of previous irritation that allowed time for the discharge to build up but again, I wasn't certain of what type – if this was a semen discharge or puss from an infection or perhaps some type of cream that was put down. I didn't know what type of discharge we were looking at entirely.

J.A. at 183. The forensic serologist who testified regarding all the lab work done on the samples taken from Brittany was also unable to identify this discharge. *See* J.A. at 350a-351a. Semen was not identified on any of the samples, but there was testimony that this fact did not rule out a male perpetrator.

Dr. Hartwig first questioned Brittany about who had injured her during his initial interview and evaluation. He testified that Brittany was at first unwilling to share any information with him, that she "clammed up" and that this is not uncommon in child victims of abuse. After Dr. Hartwig left Brittany and her mother alone for a period of time while he attended to another emergency, he returned and began the physical evaluation. "Specifically when we found the wad of toilet tissue

. . . in her underclothes I asked her who put that tissue there and she indicated, Kenneth, Kenny."

J.A. at 378a. Defense counsel did not object to the introduction of this testimony, nor did he object

to the testimony of Brittany's parents recounting similar statements she made to them at her house,

before going to the emergency room.

A jury convicted Brandt of two counts of first-degree criminal sexual conduct. The presiding

judge, Warfield Moore, of the Wayne County Circuit Court, sentenced him to two concurrent terms

of 20-40 years each.

Represented by new counsel, Brandt filed a motion for a new trial, based on the same

ineffective assistance of counsel claim presented here. Judge Moore also presided over the post-

conviction hearing to consider the motion. Brandt argued that the Supreme Court case of *Idaho v.

Wright*, 497 U.S. 805 (1990), would have applied to exclude Brittany's statements had Brandt's trial

attorney objected and cited the case. At the hearing, Brandt's trial counsel testified that his theory

of the case, developed in consultation with Brandt, was that Brittany's mother was the actual

perpetrator. He also testified that his opinion at the time was that the questionable hearsay

statements fell within either the medical treatment exception or the excited utterance exception and

therefore were not objectionable under Michigan law. Further, he believed that, if they did fall

within those exceptions, then the Confrontation Clause, as interpreted in *Idaho v. Wright*, would not

exclude them either. After making that decision, he decided to introduce additional hearsay

evidence through the testimony of Ramona Bennett, the officer in charge of Brittany's case, in an

effort to impeach and undermine prosecution witnesses. He did say that, but for his determination

that Brittany's statements to her parents and Dr. Hartwig were admissible, he would probably not

have introduced Officer Bennett's hearsay evidence.

The judge denied the motion for a new trial, finding that trial counsel had made reasonable strategic choices that should not be second guessed and agreeing with trial counsel's original assessment that there were no Confrontation Clause issues raised by the introduction of Brittany's statements.

Brandt's subsequent state court appeals were denied. The District Court denied his petition for writ of habeas corpus, granting a certificate of appealability ("COA") as to the judicial misconduct claim only. The Sixth Circuit later expanded the scope of the COA to cover both the judicial misconduct claim and the ineffective assistance of counsel claim.

**Analysis**

I. Ineffective Assistance of Counsel Claim for Failing to Object to Hearsay and for Offering Otherwise Inadmissible Hearsay

Brandt claims that his trial counsel was ineffective for failing to object when Brittany's parents and Dr. Hartwig testified that Brittany told them "Kenny" had touched her. In addition, he claims it was ineffective assistance of counsel for his lawyer to elicit hearsay statements from Officer Bennett that also identified "Kenny" as the perpetrator and provided some details of the abuse.

The Supreme Court established the governing test for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S 668 (1984). The two prongs of *Strickland* are, 1) counsel's performance was deficient, and 2) this deficient performance prejudiced petitioner. Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we must determine if the Michigan

courts' decisions were contrary to or were an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d).

In *Ohio v. Roberts*, 448 U.S. 56 (1980),[4] the Supreme Court held that, when the prosecution seeks to admit a statement from an out-of-court declarant, it has two options to satisfy the Confrontation Clause. It can either demonstrate that the statement falls within a "firmly rooted hearsay exception" or that it shows "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66. In the instant case, Brandt has stipulated that both the medical treatment and the excited utterance exceptions are "firmly rooted" but denies that the statements in question are properly included in their scope. *See White v. Illinois*, 502 U.S. 346, 356 n.8 (1992) ("There can be no doubt that the two exceptions we consider in this case [for spontaneous declarations and statements made for purposes of medical diagnosis or treatment] are 'firmly rooted.'").

On direct appeal, the Michigan Court of Appeals considered this claim and held that all relevant statements did fall within either the medical treatment exception or the excited utterance exception.

A. *Medical Treatment Exception*

The Michigan Rules of Evidence include the following hearsay exception for "Statements Made for Purposes of Medical Treatment or Medical Diagnosis in Connection with Treatment."

---

[4] In spite of petitioner's efforts to argue otherwise, the Confrontation Clause analysis from *Crawford v. Washington*, 541 U.S. 36 (2004), does not govern this case since *Crawford* was decided long after petitioner's trial, and this Court has ruled that *Crawford* does not apply retroactively. *See Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005) ("*Teague* thus prohibits Dorchy from availing himself of the new rule articulated in *Crawford*.").

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

*See* Mich. Ct. Rules Prac., Evid. R. 803(4). This rule is virtually identical to the federal hearsay exception for statements made for the purpose of medical diagnosis or treatment. *See* Fed. R. Evid. 803(4). The Michigan Supreme Court has explicitly held that "identification of the assailant [in child abuse cases] is necessary to adequate medical diagnosis and treatment."[5] *People v. Meeboer*, 439 Mich. 310, 322 (1992). This holding is consistent with the comments to Federal Rule 803(4), which state "[the exception] also extends to statements as to causation, reasonably pertinent to the same purposes, in accord with the current trend." Fed. R. Evid. 803(4), Note to Paragraph (4). Because the United State Supreme Court has found the medical treatment exception to be "firmly rooted," *see White*, 502 U.S. at 356 n.8 , and the Michigan version of that rule is consistent with the federal version as well as with the "current trend" among the states, then if Brittany's statements fit under the Michigan rule, their admission is also presumptively appropriate under the Confrontation Clause.

Brittany's statement to Dr. Hartwig, that "Kenny" had caused her injuries, is clearly admissible under Michigan's "firmly rooted" exception for statements made for the purpose of medical treatment. Brandt attempts to undermine this testimony by pointing out that she only made

---

[5]Consistent with that ruling, Dr. Hartwig testified regarding the medical bases for determining a perpetrator's identity. "[W]e want to make sure we're not sending a child home or back to an environment where the perpetrator may be. . . . It's also helpful to know if there are sexually transmitted diseases found."

the statement after she was left alone with her mother, who had indicated her belief that Brandt was

the perpetrator. But this point goes only to the weight that the jury assigns the testimony, not to its

admissibility. Since the statement clearly qualifies under a "firmly rooted" exception, we need not

analyze other indicia of reliability.[6]

B. *Excited Utterance Exception*

As for Brittany's statement to her parents, the Michigan Court of Appeals provided a

reasonable analysis for its conclusion that it qualified as an excited utterance.

> An excited utterance is a statement relating to a startling event or condition made
> while the declarant was under the stress of excitement caused by the event or
> condition. In order to fall within the excited utterance exception, a statement must
> meet the following criteria: (1) it must arise out of a startling occasion; (2) it must
> be made before there has been time to contrive and misrepresent; and (3) it must
> relate to the circumstances of the startling occasion. In this case, complainant was
> sexually assaulted, and this is a startling event. Complainant made her statements
> within hours of the attack. Moreover, the evidence showed that the complainant
> [sic] was under the sway of excitement precipitated by the assault. Thus,
> complainant's statements were also admissible as excited utterances.

The Michigan version of this exception is, again, very similar to the Federal one. *See* Fed. R. Evid.

803(2). While we agree with the Michigan court's conclusion that Brittany's statements to her

parents were properly admitted as excited utterances, we also find, in the alternative, that the

---

[6] In trying to demonstrate a lack of reliability, Brandt also points out that Brittany was found by the trial judge to be not competent to testify. Citing the Michigan statute on competency, he attempts to equate this finding to an inherent lack of trustworthiness in anything Brittany might have said. But during the post-conviction hearing on the motion for a new trial, Judge Moore clarified the basis for his original incompetency ruling. "I might come to the conclusion that that child does not have sufficient recall of those circumstances that time ago to testify. So, therefore, she's incompetent but that would not have meant that she didn't have sufficient recall the day it happened." J.A. at 167a.

admissibility of Dr. Hartwig's testimony regarding the identity of the assailant makes admission of the parents' statements merely duplicative and, at most, harmless error. *See Schneble v. Florida*, 405 U.S. 427, 432 (1972) ("Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. In this case we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to [co-defendant's] admission been excluded. The admission into evidence of these statements, therefore, was at most harmless error.").

The admissibility of Brittany's statements under these two "firmly rooted" hearsay exceptions causes a domino effect, with the result that all variations of Brandt's ineffective assistance of counsel claim must fail.

First, under the Michigan rules of evidence, the statements were admissible, and Brandt was therefore not prejudiced by his counsel's failure to object.

Second, under the Confrontation Clause jurisprudence as it existed at the time, the admission of any statement that fell within a "firmly rooted" exception was, by definition, not a violation of the Confrontation Clause, meaning that a failure to object on constitutional grounds did not prejudice Brandt. In *Idaho v. Wright*, 497 U.S. 805 (1990), on which Brandt relies heavily in his argument, the Supreme Court was faced with a state ruling that a physician's hearsay testimony, regarding a child abuse victim's statements, fell within the state's *residual* hearsay exception. Since that exception was not "firmly rooted," the Court, following *Ohio v. Roberts,* engaged in a more exacting analysis of the statements to determine their trustworthiness. The current situation involves "firmly rooted" exceptions and is therefore clearly distinguishable from *Wright*.

-11-

Finally, because Brittany's identifying statements were admissible, trial counsel's decision to introduce additional hearsay statements by Officer Bennett was a reasonable strategic decision designed to impeach prosecution witnesses and mitigate the damage done by the original hearsay identifications by showing that Brittany had been coached. Defense counsel pointed out that, in her statements to Officer Bennett, Brittany did not mention anal penetration and she used the "sophisticated" biological term vagina. These efforts at mitigation were reasonable and therefore did not violate the *Strickland* standard.

## II. Judicial Bias and Judicial Misconduct Claim

Brandt also claims that he was denied his right to a fair trial by several of Judge Moore's preliminary comments to the jury, which allegedly indicated bias in favor of the prosecution, and by the judge's numerous interruptions and "scolding" of defense counsel during his questioning of witnesses.

The Supreme Court's standard for claims of judicial misconduct, which are grounded in the Due Process clause of the Fourteenth Amendment, is found in *Liteky v. United States*, 510 U.S. 540 (1994). In that case, the Court announced an exacting standard.

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky*, 510 U.S. at 555.

In this case, the judge's pre-trial comments to the jury were, while sometimes imprecise, clearly not prejudicial. Taken in isolation, several statements do appear problematic, but when read in context it is clear that no serious errors were made. For example, Brandt points to the following statement by the judge.

> You're looking at [the defendant] and he is charged with penetrating - I don't know whether he - what he penetrated her with, it isn't necessarily his penis, but it might be his penis, I don't know. But I'll leave that to the proofs, I'll leave that to the prosecution, because the law doesn't require that penetration be about a penis. It simply means that the person was penetrated for sexual purposes or gratification.

J.A. at 59a. This statement is troubling because it implied that the defendant did, in fact, penetrate the victim with something. But again, the surrounding statements demonstrate that the judge was speaking hypothetically and that he expected the jury to presume innocence until proven guilty by the prosecution. In explaining the roles of the various parties, Judge Moore also described himself, along with all the people in the room and in the state, as the "clients" of the prosecutor. Brandt frames this as an expression of bias in favor of the prosecutor. Finally, in discussing the presumption of innocence, the judge said, "Kenneth Brandt, being accused of a crime, even this crime, is presumed innocent, ladies and gentlemen, and you must in your mind say you're able to presume him innocent to sit here as a juror." Brandt claims that this "wholly inappropriate comment . . . focused the jury's attention on the nature of the crime, rather than on the presumption of evidence [sic]."

When the judge's preliminary comments to the jury are read in their entirety, it is clear that he spent a great deal of time explaining the trial process, the roles of the parties, the

presumption of innocence and the burden of proof. His explanations are lengthy and involved, and peppered with personal anecdotes, but they are also very accurate, except arguably for the few isolated statements identified by petitioner. These statements may appear to be inappropriate when viewed in isolation, but they are inconsequential when viewed as part of the larger context in which they were presented.

The judge's frequent interruptions of defense counsel during his questioning of witnesses, however, are more troubling. Brandt claims that the judge interrupted him "at least eight times during counsel's questioning of various witnesses." Many of these were *sua sponte*. But more important than the number of interruptions, Brandt argues, was the negative and harsh tone used by the judge during these interruptions. A review of the roughly 300 pages of transcript provided in the appendix corroborates these concerns. Judge Moore was particularly protective of the victim's mother, Sherry Faes, during defense counsel's cross-examination, which was significant given the defense's theory that Ms. Faes was the real perpetrator.

As pointed out in the District Court's opinion, this is not the first time our Court has addressed the conduct of this particular trial judge. In *Allen v. Hawley*, No. 01-1320, 2003 WL 21911327 (6th Cir. Aug. 7, 2003) (unpublished), a divided panel affirmed the denial of a prisoner's habeas petition, which was based on the claim that he did not receive a fair trial due to Judge Moore's bias and misconduct. In that case, Judge Clay wrote a scathing and detailed dissent addressing a great deal of Judge Moore's behavior and comments, some of which were very similar to what we face in the current case.

Similarly, neither the Michigan Court of Appeals nor the District Court was entirely

comfortable with how this trial was conducted, in spite of the fact that both ultimately denied

petitioner's claim for relief. The Michigan court described the judge's conduct as "skirting the

edge" of appropriate behavior. *See* J.A. at 24a. The District Court went even farther, stating its

opinion that "the Michigan Court of Appeals reached an incorrect result" in dismissing

petitioner's claim. But, applying federal habeas law, the District Court did not believe the

Michigan court's decision was an *unreasonable* application of federal law and therefore

dismissed the petition. *See* J.A. at 45a.

We agree that Judge Moore's conduct in this case was, at times, quite inappropriate. But

we also agree with the District Court's application of AEDPA, which requires that we not grant

the writ of habeas corpus unless the state court's decision represents an unreasonable application

of Supreme Court precedent. Given the very high standard articulated in *Liteky*, we do not find

the Michigan decision to be unreasonable.

For the reasons discussed above, we affirm the District Court's denial of Brandt's

petition for writ of habeas corpus