561 F.2d 8
 UNITED STATES of America, Plaintiff-Appellee,
v.
Carlton L. "Corky" SMITH, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Wayne BATES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gary D. HILL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gregory Charles HILL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
C. Allen CHRISTOPHER et al., Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jim KEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Herb JOHNSON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
William WOODALL, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John ULREY, a/k/a John Taliferro, Defendant-Appellant.
 Nos. 77-5038 to 77-5046.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 20, 1977.
Decided Aug. 26, 1977.
Rehearing and Rehearing En Banc Denied Oct. 10, 1977.
Certiorari Denied Nov. 14, 1977.
See 98 S.Ct. 487.
 
 D. Shannon Smith, Gilday, Jung & Gilday, Cincinnati, Ohio (court appointed), for defendant-appellant in No. 77-5038.
 Charles H. Anderson, U. S. Atty., Lawrence Ray Whitley, Nashville, Tenn., for United States.
 Charles R. Ray, Barrett, Brandt & Barrett, Nashville, Tenn. (court appointed), for defendant-appellant in No. 77-5039.
 C. Douglas Thoresen, Nashville, Tenn. (court appointed), for defendant-appellant in No. 77-5040.
 Clark H. Tidwell, Nashville, Tenn. (court appointed), for defendant-appellant in No. 77-5041.
 G. Whitney Kemper, Kemper & Vance, Nashville, Tenn. (court appointed), for defendant-appellant in No. 77-5042.
 Larry R. Williams, Dale, Thompson & Miles, Nashville, Tenn. (court appointed), for defendant-appellant in No. 77-5043.
 William N. Fielden, Eichhorn, Fielden, Wetherbee & Coates, San Diego, Cal. (court appointed), for defendant-appellant in No. 77-5044.
 Herb Johnson, pro se.
 Henry A. Martin, Haile & Martin, Nashville, Tenn. (court appointed), for defendant-appellant in No. 77-5045.
 Cleve O. Weathers, Nashville, Tenn. (court appointed), for defendant-appellant in No. 77-5046.
 Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 These appeals are the aftermath of an ambitious federal prosecution which put an unscrupulous commercial enterprise out of the business of bilking hundreds of would-be entrepreneurs across the country of millions of dollars. Five jointly controlled corporations, operating out of Nashville, Tennessee, and thirty of their officers and marketing employees were named in a fifty-two count indictment charging substantive violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and conspiracy to commit these crimes, 18 U.S.C. § 2. After disposition of the cases against the majority of the defendants by guilty pleas and otherwise, one of the corporations and eleven individuals, including the Appellants, went to trial solely on the conspiracy count. The trial court denied preliminary defense motions for severance as well as motions for acquittal at the conclusion of the evidence. The jury returned guilty verdicts as to all defendants, and nine of the convicted individuals perfected these appeals.
 
 
 2
 The Government elicited testimony from 153 witnesses and introduced more than 170 physical exhibits during the month-long trial. Only one of the Appellants, Herb Johnson, took the stand on his own behalf. The evidence revealed that two of the principal conspirators, both of whom pled guilty prior to trial, conceived and launched an elaborate scheme to market sham wholesale "distributorships" for chemical products. To convince others of the "soundness" of these chimerical investment opportunities, they set about to exploit high pressure sales techniques bolstered by false and misleading representations.
 
 
 3
 These initial conspirators incorporated L.O.C. Industries which commenced, in January 1975, to sell allegedly exclusive, regional "distributorships" for "Seal-Tite", a tire puncture-proofing sealant of questionable effectiveness. In time, L.O.C. also began to market "distributorships" for "Less-Mow," a grass growth-retardant chemical with equally suspect functional properties. L.O.C. remained in business until December 18, 1975, when its operations were abruptly terminated by an FBI raid during which search and arrest warrants were executed and a substantial quantity of incriminating evidence seized.
 
 
 4
 Four subsidiary corporations were formed during L.O.C.'s brief existence. Two served as "front" organizations for the marketing of wholesale "distributorships" for other marginally effective products (including another tire puncture sealant and a bogus motor oil enhancing additive). The other two provided marketing support services intended to lend an air of credibility to the entire venture.
 
 
 5
 Intercontinental Telephone Promotions, Inc., employed a force of telephone solicitors who made all the initial contacts with prospective "distributors" and set up field appointments for all L.O.C. salesmen, including those ostensibly representing the two marketing subsidiaries. Its solicitors used a standard telephone presentation or "pitch" which remained virtually the same, regardless of which product "distributorship" was being sold. This text misrepresented the way that the prospects had been selected to be contacted, the amount of money to be spent by L.O.C. to promote the product in the prospect's region, the place of business of several of the corporations[1] as well as other material facts. Appellant Carlton L. "Corky" Smith initially joined this operation as a telephone solicitor and was ultimately promoted to telephone supervisor.
 
 
 6
 National Motor Transport Association was a "paper" corporation which represented itself to be an established product certifying organization. It claimed to have performed quality assurance tests on the various products marketed by L.O.C. and its subsidiaries. In fact, no valid tests were ever conducted. Instead, impressive sham test results were elaborately fabricated for dissemination to prospective "distributors" by L.O.C. salesmen. Appellant James Wayne Bates served as the president of this subsidiary in addition to his other duties as L.O.C. pilot and assembler/custodian of the firm's tangible sales aids ("pitch books" and give-away promotional items).
 
 
 7
 The remaining Appellants were employed as field salesmen for one or more of the product "distributorships". During a brief training period, salesmen were routinely required to memorize a sales "pitch" which was rife with factual misrepresentations. In addition, they each were issued a large looseleaf binder known as a "pitch book" and were instructed to flash its contents to reinforce their verbal presentations. The "pitch book" allegedly contained copies of letters of commendation and photographs attesting to the upstanding character of L.O.C. (or its respective marketing subsidiary), testimonials from "satisfied" product distributors and commercial users, and "independent" consumer test results designed to convince prospects that they were dealing with a company of national stature. Unfortunately, upon close scrutiny (which the high pressure sales technique expressly discouraged) many of the items in the "pitch book" proved to be blatant forgeries or misleading pastiches.
 
 
 8
 Salesmen routinely made unfounded assertions concerning the effectiveness of the products[2] and the financial rewards to be realized by new "distributors". They frequently used assumed names and false corporate titles, sold geographically overlapping distributorships while representing their exclusivity, and claimed that extensive post-sale field support and advertising would be provided when none was forthcoming. They also placed prospects in telephone contact with paid operatives (called "singers") who posed as enthusiastic established distributors. Salesmen often represented that they would return after product delivery to help set up the new distributorship, knowing that post-sale contact was against company policy.
 
 
 9
 In sum, the duty of the L.O.C. salesman, in furtherance of the conspiracy, was to extract a substantial sum of money (in immediately negotiable form) from an unwary prospect during a single encounter and then disappear. For this service salesmen were handsomely compensated on a commission basis. Of the seven Appellants who sold distributorships, individual earnings ranged from $34,000 (for less than 5 months' work) to in excess of $90,000. The substantial number of sales which these commissions represent is suggested by the fact that the average "distributor" paid approximately $4,000 for his product inventory.
 
 
 10
 As new "distributors" began to realize that L.O.C. was not going to honor its commitments, the frequency of irate telephone calls to Nashville predictably increased. The perpetrators of the fraud anticipated this development by installing a unique facility in L.O.C.'s headquarters known as the "heat room". Calls were routinely directed to the "heat room" if the callers asked to speak to a mock employee identified by the salesmen as the appropriate contact at L.O.C. for follow up inquiries. The "heat room" was staffed with specially trained employees who attempted to mollify disgruntled "distributors" through obfuscation, delay, and, if all else failed, the making of additional false representations of convenience.[3] Through this insidious mechanism, the conspirators succeeded in forestalling criminal prosecution until $4.4 million of virtually worthless "distributorships" had been foisted upon more than 1,000 innocent victims.
 
 
 11
 Appellants advance seven grounds for reversal of their convictions, four of which merit discussion. Appellants claim that 1) the evidence was insufficient to prove their knowing and willful participation in the L.O.C. conspiracy; 2) remarks made by the prosecutor during rebuttal argument to the jury were so inflammatory and prejudicial as to deny them a fair trial; 3) the Court's persistent questioning of witnesses and its comments upon the evidence betrayed a marked partiality to the prosecution which invaded the province of the jury to weigh the evidence independently; and 4) the Court's jury instruction defining the "reckless indifference" standard for false and fraudulent statements was legally erroneous.
 
 
 12
 Appellants do not contest the existence of a management level conspiracy. Rather they allege that, as mere employees, they lacked the opportunity to become purposefully involved in furthering its criminal objectives. In their view the evidence confirms that each of them had such limited responsibilities within the L.O.C. enterprise as to have been insulated from any knowledge of wrongdoing. Appellants claim that they were thoroughly convinced of the legitimacy of their employer and the quality of the products which they promoted. Therefore, all arguably fraudulent representations were made at the behest of L.O.C. management in the belief that they were true.
 
 
 13
 We have studied the voluminous record and, viewing the evidence in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we find that the jury could rationally infer from the business behavior of the Appellants that they were knowing participants in the conspiracy with a substantial stake in its continued success. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). Once the existence of a conspiracy has been established, only slight additional evidence is required to connect a particular defendant with it. United States v. Chambers, 382 F.2d 910 (6th Cir. 1967). Here ample proof established that Appellants either routinely exploited fraudulent sales practices, devised and encouraged by L.O.C. management, or prolonged the life of the conspiracy by temporarily placating bilked "distributors."
 
 
 14
 All of Appellants, save Carlton L. Smith, were privy to the contents of the "pitch book." Although now they would have us believe that they had no reason to doubt its authenticity, the record suggests that a cursory examination would have revealed such blatant earmarks of fraud as to have placed even a prudent outsider on notice of irregularity. Therefore, the jury was not bound to accept Appellants' claim of innocent reliance:
 
 
 15
 It is settled law that a finding of guilty knowledge may not be avoided by a showing that the defendant closed his eyes to what was going on about him; 'see no evil' is not a maxim in which the criminal defendant should take any comfort. United States v. Hanlon, 548 F.2d 1096, 1101 (2nd Cir. 1977).
 
 
 16
 Appellants Smith and James Wayne Bates had supervisory responsibilities which put them in contact with L.O.C. management on a frequent basis and afforded them ample opportunity to perceive the scope of the conspiracy and their roles in furtherance of it. The jury could "properly consider the circumstances of (their) position(s) in the corporation in deciding the question of knowledge." United States v. West, 549 F.2d 545, 551 (8th Cir. 1977). Finally, all the Appellants continued to work for L.O.C. and directly profit from its integrated operations although other employees abruptly resigned after brief tenures rather than continue to participate in an obviously dishonest operation. Appellants' conduct, coupled with evidence of admissions by several of them which implicitly betrayed scienter, provided sufficient circumstantial underpinnings to sustain the jury's conclusion that Appellants were knowing co-conspirators. United States v. Van Hee, 531 F.2d 352, 357 (6th Cir. 1976).
 
 
 17
 We find no merit in Appellants' assertion that prosecutorial misconduct requires the granting of a new trial. The few inappropriate remarks, made by the prosecutor during prolonged rebuttal argument to the jury, do not strike us as reversible error under the four-pronged test prescribed in United States v. Leon, 534 F.2d 667, 670 (6th Cir. 1976). These isolated, pejorative characterizations of the defendants, cloaked in the main in metaphoric terms, were nothing more than overzealous, emotional responses to strained exculpatory arguments advanced by the defense. Taken out of context, they may seem to perilously approach that level of vituperativeness condemned by the Supreme Court in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). However, read as incidents within nineteen transcript pages of rebuttal, at the close of a heated, month-long trial, they seem neither so scurrilous in their implications nor so cumulative in their impact as to have influenced the verdict. In contrast to the records in United States v. Love, 534 F.2d 87 (6th Cir. 1976), and United States v. Wiley, 534 F.2d 659 (6th Cir. 1976), which warranted reversal of the convictions, here the prosecutor's hyperbole was arguably supported by the evidence and did not pander to virulent popular prejudices.
 
 
 18
 Appellants next assert that their trial was irreparably tainted by judicial misconduct manifest in the court's excessive, partisan participation in the interrogation of witnesses and its allegedly prejudicial comments on the significance of the evidence. They further contend that a cursory, curative instruction, included in the court's final charge to the jury, was inadequate to purge the taint, citing Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). No contemporaneous objections to the court's active participation were raised by the defense during the trial. Therefore, we must review the record under the more stringent "plain error" standard articulated in Rule 52(b) of the Federal Rules of Criminal Procedure.
 
 
 19
 Appellants cite approximately 250 questions posed by the judge to a witness in the presence of the jury. As a bare statistic, we cannot say that this figure represents excessive judicial intervention during a one-month trial. Invariably, counsel for both sides were allowed to conduct the bulk of each examination. It is settled law that
 
 
 20
 the presiding Judge may intercede in the questioning of a witness because of seeming inadequacy of examination or cross-examination by counsel, or to draw more information from reluctant witnesses or experts who are inarticulate or less than candid. Also, as a proper exercise of his discretion he may propound questions pertinent to a confused factual issue which requires clarification. See United States v. Carabbia, 381 F.2d 133 (6th Cir. 1967) (additional citations omitted). United States v. Burch, 471 F.2d 1314, 1317 (6th Cir. 1973).
 
 
 21
 We do not believe that the trial judge abused this discretion in the instant case. Given the nature of the charges and the number of defendants involved, the triable issues were inherently complex. The court quite properly interceded to assure that the testimony was understandable to the jury and did not obscure the legal questions to be resolved. Knapp v. Kinsey, 232 F.2d 458, 466 (6th Cir. 1956); United States v. Carabbia, 381 F.2d 133, 139 (6th Cir. 1967); United States v. DiVarco, 484 F.2d 670 (7th Cir. 1973).
 
 
 22
 The fact that testimony elicited by the judge frequently proved damaging to Appellants' cause does not automatically cast the court in the improper role of surrogate prosecutor. Here there was no strategic focusing of judicial questioning to favor the Government, as, for example, where the Court devotes inordinate attention to cross examining defense witnesses. See, e. g., United States v. Sheldon, 544 F.2d 213 (5th Cir. 1976); United States v. Hill, 332 F.2d 105 (7th Cir. 1964). The judge sparingly interrogated both prosecution and defense witnesses alike during direct and cross-examination. The disparity between the volume of evidence marshalled by the two sides was not further skewed in the Government's favor by this evenhanded, judicial intervention.
 
 
 23
 Appellants further object to a few, isolated comments by the judge relating to the facially fraudulent character of the "pitch books". Although the Government did not need to prove that the "pitch books" were fraudulent to sustain the conspiracy convictions, we agree with Appellants that a showing that these books were a sham would tend to prove scienter, a key element of the crime. Therefore, to the extent that the judge's comments concerning the "pitch books" betrayed to the jury a predisposition on this issue, error was committed. See United States v. Ornstein, 355 F.2d 222 (6th Cir. 1966). Based upon our review of the entire record, however, we find that the challenged comments were not sufficiently prejudicial to the substantial rights of the Appellants to warrant granting a new trial. Our conclusion in Gariepy v. United States is directly applicable here:
 
 
 24
 In the context, the Judge's remarks would not tend to create the impression upon the jury that he considered the proof already adduced sufficient to establish the guilt of the accused. 220 F.2d 252, 263 (6th Cir. 1955).
 
 
 25
 Because we hold that no reversible error was committed, the sufficiency of the trial court's curative instruction need not be addressed.
 
 
 26
 As their last substantial assignment of error, Appellants question the validity of the following jury instruction:
 
 
 27
 A statement or representation is false or fraudulent within the meaning of this statute if known to be untrue or made with reckless indifference as to its truth or falsity, and made or caused to be made with the intent to deceive. (emphasis added).
 
 
 28
 In particular, Appellants assert that the "reckless indifference" language, by substituting arcane theories of negligence for a finding of mens rea, vitiated the presumption of innocence in derogation of their due process rights. At the outset, we observe that the trial court inadvertently imposed a more severe burden of proof upon the Government than required by the case law. See, e. g., United States v. Halon, 548 F.2d at 1101-1102. It did so by linking the "reckless indifference" and "intent" elements of the charge in the conjunctive. The jury was effectively instructed that criminal intent was always a required element to be proved. Therefore, any arguable shortcomings in the Court's exposition of reckless conduct had no bearing on the verdicts because the jury had to find criminal intent in order to convict.[4] We find no reversible error here.
 
 
 29
 We have considered all of Appellant's additional claims concerning irregularities in their trial and have rejected them as being without merit.
 
 
 30
 The convictions are affirmed.
 
 
 
 [1]
 The marketing subsidiaries were falsely represented as having their offices in Texas (as alleged affiliates of legitimate petroleum companies). Therefore, telephone solicitors were frequently required to pretend that they were calling from Texas. This ruse went to such extremes that, for a time, Texas weather conditions were posted daily in L.O.C.'s Nashville, Tennessee facility
 
 
 [2]
 In selling "Seal-Tite," for example, a demonstration tire was used. Contrary to the sales "pitch" that only 4 ounces of the product were required to seal 1/4 inch diameter punctures, the demonstration tire was filled with a minimum of one-quart of sealant (often substantially more). At the suggested retail price for the product, a customer would be required to pay over $20 for that quantity ("distributor" cost exceeded $42 per gallon)
 
 
 [3]
 A standard explanation for the lack of field support for the new "distributor" was that he had purchased too small an initial inventory of the respective product. Using this "line," the "heat room" staff attempted to get the dissatisfied customer to part with even more money
 
 
 [4]
 Any potential, logical inconsistency between reckless and intentional conduct was removed by the Judge's failure to legally define recklessness. We have no reason to assume that the jurors were confused, given that they had received a proper definition of "intent" at another point in the Court's charge